**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

STACI ANNE ROTH,              )
                              )        Civil Action No. 12-992
            Plaintiff,        )
                              )
        v.                    )        Magistrate Judge Cynthia Reed Eddy
                              )
CAROLYN COLVIN,               )
Commissioner of Social Security,  )    Electronic Filing
                              )
            Defendant.        )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Staci Anne Roth ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking

review of the final determination of the Commissioner of Social Security ("Defendant" or

"Commissioner") denying her application for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). This matter comes before the court on cross

motions for summary judgment. (ECF Nos. 11, 13). The record has been developed at the

administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment will

be GRANTED, in part, and DENIED, in part, and Defendant's Motion for Summary Judgment

will be DENIED.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on July 23, 2008, claiming a disability onset date of March 18, 2008. (R. at 147 – 54)[1]. Her claimed inability to work full-time allegedly stemmed from a number of physical conditions including spondylolisthesis, osteoarthritis, back pain, a broken surgical implant in the ankle, and fibromyalgia. (R. at 181). Plaintiff was initially denied benefits on December 5, 2008. (R. at 84 – 87). A hearing was scheduled for June 2, 2010, and Plaintiff appeared to testify, represented by counsel. (R. at 34 – 69). A vocational expert was not present. (R. at 34 – 69). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on August 13, 2010. (R. at 15 – 30). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on May 11, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 6).

Plaintiff filed her Complaint in this court on July 16, 2012. (ECF No. 1). Defendant filed an Answer on October 12, 2012. (ECF No. 6). Cross motions for summary judgment followed. (ECF Nos. 11, 13). The matter has been fully briefed.

## III. STATEMENT OF THE CASE

### A. General Background

Plaintiff was born on June 19, 1963, and was forty six years of age at the time of her administrative hearing. (R. at 38). She was a high school graduate with some post-secondary education, but no degree. (R. at 38). Plaintiff moved from her place of residence in California, to Florida, to live with her mother in a condominium. (R. at 38). Plaintiff had stopped working as of March 2008, and her mother did not make her contribute rent. (R. at 60). Plaintiff's

---

[1]    Citations to ECF Nos. 7 – 7-14, the Record, *hereinafter,* "R. at __".

mother also helped her with daily tasks such as cooking, cleaning, and traveling due to alleged limitations as a result of significant back and leg pain. (R. at 60 – 62).

Plaintiff's relevant work history included periods of employment as a server at a restaurant, bank supervisor, medical research assistant, payroll manager, bartender, mortgage brokerage loan officer, and office manager between 1998 and 2008. (R. at 39 – 42, 44). At the time of her hearing, Plaintiff did not have a source of income, and did not have health insurance.

## B. Medical History

Plaintiff began seeing orthopedic specialist Rajiv Puri, M.D. on March 21, 2005 for complaints of longstanding low back pain with intermittent radiation into the right ankle. (R. at 270 – 71). Plaintiff was a resident of California at that time. Dr. Puri examined Plaintiff and observed tenderness over the lumbar spine and somewhat limited range of motion. (R. at 270 – 71). A neural examination was unremarkable. (R. at 270 – 71). Plaintiff was diagnosed with degenerative spondylolisthesis at the L4-L5 level of the spine, and disc disease at the L5-S1 level. (R. at 270 – 71). X-ray studies confirmed these diagnoses. (R. at 270 – 71). Plaintiff was advised to take Mobic or Motrin for pain, and engage in physical therapy at home. (R. at 270 – 71). No need for surgery was indicated, and Plaintiff was advised to follow up as needed. (R. at 270 – 71).

Dr. Puri examined Plaintiff again in July 2007. (R. at 266). Plaintiff complained of persistent pain in the lower back with radiation into the right leg. (R. at 266). Plaintiff was noted to have done well with at-home physical therapy exercises, to that point. (R. at 266). Upon examination, there was tenderness noted in the lumbar spine, with mildly positive root tension in the right lower extremity. (R. at 266). She was diagnosed with degenerative disc

disease of the lumbar spine, with radicular pain in the right leg. (R. at 266). Dr. Puri provided a prescription for Feldene and Vicodin. (R. at 266).

On April 7, 2008, Plaintiff again appeared at Dr. Puri's practice for worsening pain in the lower back with radiation into the right leg. (R. at 264). Plaintiff was found to experience pain in her left ankle as a result of failure to have implanted hardware removed after an earlier operation. (R. at 264). Dr. Puri indicated that physical examination demonstrated significant tenderness over the lumbar spine and limited range of motion, particularly with respect to extension. (R. at 264). Plaintiff's posture was negatively affected. (R. at 264). She exhibited a positive root tension sign in her right leg. (R. at 264). Plaintiff was diagnosed with degenerative disc disease in the lumbar spine, with radicular symptoms, and with old open reduction internal fixation of fractured left ankle. (R. at 264). Plaintiff did not have health insurance at the time, but had some roll-over funds available from another insurance policy, and was therefore scheduled for an MRI and x-ray of the lumbar spine, as well as an x-ray of the left ankle. (R. at 264). Plaintiff was prescribed Norco for pain. (R. at 264).

Plaintiff underwent her MRI of the lumbar spine on June 17, 2008. (R. at 257 – 58). The study revealed normal curvature of the spine, and normal marrow signal intensity. (R. at 257 – 58). At the L4-L5 level of the spine, grade 2 anterolisthesis, severe stenosis of the right neural foramen, mild stenosis of the left neural foramen, and moderate stenosis of the right lateral recess was found. (R. at 257 – 58). At the L5-S1 level, there was mild degenerative change at the facet joints. (R. at 257 – 58).

Plaintiff attended her follow-up appointment with Dr. Puri on June 23, 2008. (R. at 261 – 62). Continued complaints of pain in Plaintiff's lower back and left ankle were reported. (R. at 261 – 62). Dr. Puri also noted new complaints of pain in the right knee. (R. at 261 – 62). Based

4

upon diagnostic imaging studies, Dr. Puri diagnosed spondylolisthesis at the L4-L5 level of Plaintiff's spine, early degenerative joint disease of the right knee, and broken hardware in the left ankle. (R. at 261 – 62). Plaintiff was prescribed Vicodin and Celebrex. (R. at 261 – 62). Plaintiff would be considered for spine and ankle surgery once she obtained Social Security benefits. (R. at 261 – 62).

Plaintiff was admitted to the emergency department of St. Mary Medical Center in Apple Valley, California on August 8, 2008. (R. at 301 – 11). Plaintiff's primary complaint was pain in her right knee. (R. at 301 – 11). Plaintiff was diagnosed with a sprained knee and was informed that she should follow up with her physician. (R. at 301 – 11). She was provided prescription pain medication. (R. at 301 – 11).

Plaintiff was again seen in the emergency department of St. Mary Medical Center in Apple Valley, California on August 17, 2008. (R. at 290 – 300). Plaintiff was complaining of knee and ankle pain. (R. at 290 – 300). Plaintiff was provided with Percocet for her pain and was discharged. (R. at 290 – 300). She was stable and ambulatory. (R. at 290 – 300). Plaintiff was diagnosed with a knee sprain. (R. at 290 – 300). She was advised to follow up with her physician. (R. at 290 – 300).

State agency evaluator Pamela Ombres, M.D. completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff on August 25, 2008. (R. at 316 – 22). She concluded that the evidence of record supported a finding of impairment in the left ankle status post fixation with hardware, early degenerative joint disease of the right knee, spondylolisthesis, and obesity. (R. at 316 – 22). Based upon her review of the medical record, Dr. Ombres determined that Plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing and walking approximately six hours of an eight hour work day, sitting approximately

5

six hours, and frequently balancing, stooping, kneeling, crouching, and crawling. (R. at 316 –
22). Plaintiff could only occasionally climb ramps and stairs, and could never climb ladders,
ropes, or scaffolds. (R. at 316 – 22). In her discussion of the findings, Dr. Ombres believed that
Plaintiff's allegations were only partially credible. (R. at 316 – 22). She noted that Plaintiff was
capable of living independently, completing household chores, feeding a pet, cooking simple
meals, going out, driving, shopping, and managing her funds. (R. at 316 – 22).

Dr. Puri completed a summary of his treatment of Plaintiff in November 2008. (R. at 323
– 24). He opined that Plaintiff had been suffering from low back pain with radiation into her
lower extremities for several months when he first examined her. (R. at 323 – 24). He
prescribed medication and physical therapy for treatment. (R. at 323 – 24). Plaintiff's left ankle
also began to exhibit increasing symptoms of pain as a result of broken fixation hardware from
an earlier surgery. (R. at 323 – 24).

Dr. Puri felt that the conservative treatment that he recommended for Plaintiff had – by
and large – not provided lasting relief. (R. at 323 – 24). Plaintiff's increasingly severe pain
required the use of "heavy-duty narcotic" medication. (R. at 323 – 24). Dr. Puri indicated that
Plaintiff's diagnoses included grade II spondylolisthesis at the L4-L5 level of the spine,
degenerative disc disease at the L5-S1 level, arthritis with internal derangement of the right knee,
and painful hardware in the ankle. (R. at 323 – 24). Dr. Puri believed that Plaintiff would
require a spinal fusion, right knee surgery, and removal of the hardware from her ankle to
improve her pain symptoms. (R. at 323 – 24). Plaintiff would not be able to work for over
twelve months in the event that she proceeded with the surgical interventions. (R. at 323 – 24).

State agency evaluator Edward Holifield, M.D. completed a Physical RFC of Plaintiff on
December 4, 2008. (R. at 326 – 33). Based upon his review of the evidence in Plaintiff's record,

6

Dr. Holifield concluded that Plaintiff's impairments included spondylolisthesis and degenerative joint disease. (R. at 326 – 33). As a result of said impairments, Plaintiff would be limited to occasionally lifting twenty pounds, frequently lifting tens pounds, standing and walking approximately six hours of an eight hour work day, and sitting approximately six hours. (R. at 326 – 33). Plaintiff would need to avoid concentrated exposure to vibration. (R. at 326 – 33).

Following her move to Florida to live with her parents, Plaintiff was treated by Mohamed G. Shoreibah, M.D. as a primary care physician. Her first visit with Dr. Shoreibah was February 13, 2009. (R. at 339 – 41). Plaintiff explained that she had been receiving treatment for chronic back pain. (R. at 339 – 41). She desired a referral to a spinal surgeon. (R. at 339 – 41). Plaintiff also described experiencing pain in her right knee and left ankle. (R. at 339 – 41). She felt that these conditions did not require any assessment at that time. (R. at 339 – 41).

Upon physical examination, Dr. Shoreibah found that Plaintiff had tenderness over the lumbar spine. (R. at 339 – 41). Plaintiff could perform a leg raise test while sitting, but not while lying down – due to pain. (R. at 339 – 41). She had crepitus in her right knee, but good range of motion. (R. at 339 – 41). Plaintiff's showed no sensory deficits. (R. at 339 – 41). Dr. Shoreibah prescribed Darvocet for Plaintiff's pain and referred her for pain management. (R. at 339 – 41).

Plaintiff began an approximately once-monthly pain management regimen with Saqib Khan, M.D. on February 23, 2009. (R. at 371 – 73). At her initial visit with Dr. Khan, it was noted that Plaintiff complained of low back pain, arthritis, right knee pain, left foot pain due to broken surgical hardware, right hip pain, and shooting pain in the right leg. (R. at 371 – 73). Plaintiff explained that her pains were chronic and severe, and was often accompanied by cramping, tingling, and numbness. (R. at 371 – 73). Maintaining a particular position for too

7

long exacerbated Plaintiff's pain. (R. at 371 – 73). Movement also worsened her pain. (R. at 371 – 73). Plaintiff told Dr. Khan that there was no relief for her pain through physical activity. (R. at 371 – 73). Medication provided fifty to sixty percent decrease in pain. (R. at 371 – 73).

Dr. Khan observed that Plaintiff was well-nourished, pleasant, and alert. (R. at 371 – 73). Her gait favored her right side. (R. at 371 – 73). She had decreased range of motion in her left ankle and right knee. (R. at 371 – 73). Plaintiff had decreased response to pinprick and temperature in her right leg and at the L4-S1 levels of her spine. (R. at 371 – 73). Plaintiff had diminished strength and range of motion in her right hip. (R. at 371 – 73). Tenderness, spasm, and decreased range of motion were seen in the lumbar spine. (R. at 371 – 73). Similar findings were noted in the thoracic spine. (R. at 371 – 73). Straight leg raising was decreased on Plaintiff's right side. (R. at 371 – 73). Her spinal curvature was normal. (R. at 371 – 73). Dr. Khan diagnosed low back pain, lumbar disc disease, facet arthropathy syndrome, sacroilitis, and sacroiliac syndrome. (R. at 371 – 73). Plaintiff was started on Vicodin, but declined a lumbar epidural because she would have to pay out-of-pocket. (R. at 371 – 73).

Plaintiff was seen again by Dr. Khan on March 23, 2009. (R. at 369 – 70). He noted continued complaints of pain, particularly in her lower back. (R. at 369 – 70). Dr. Kahn observed that Plaintiff was alert and in no acute distress. (R. at 369 – 70). She exhibited tenderness, spasm, decreased range of motion, and trigger points in her lumbar spine. (R. at 369 – 70). All of Plaintiff's extremities demonstrated decreased range of motion and sensation to pinprick and temperature change. (R. at 369 – 70). Plaintiff did have full motor strength. (R. at 369 – 70). She was diagnosed with lumbosacral radiculitis, low back pain, lumbar disc disease, and sacroilitis. (R. at 369 – 70). Plaintiff was to continue taking Vicodin. (R. at 369 – 70).

Plaintiff visited Dr. Shoreibah again on April 13, 2009. (R. at 337 – 38). He noted continuing complaints of right knee pain, left ankle pain, and back pain. (R. at 337 – 38). Plaintiff reported that she was satisfied with her pain management regimen, was more physically active, and was able to exercise on a treadmill. (R. at 337 – 38). She had experienced some leg cramping at night. (R. at 337 – 38). Plaintiff wanted to put off seeing a neurosurgeon for her back. (R. at 337 – 38). Dr. Shoreibah started her on Vicodin. (R. at 337 – 38).

Plaintiff was seen by an associate of Dr. Khan's, William Vargas, M.D., for pain management on April 21, 2009. (R. at 367 – 78). Physical findings were largely the same since her last visit. (R. at 367 – 78). Plaintiff was experiencing relief from her pain medications and informed Dr. Vargas that the medications were working "well." (R. at 367 – 78). She had also been exercising, but was noticing increased muscle tightening. (R. at 367 – 78). She was continued on Vicodin. (R. at 367 – 78).

At visits with Drs. Khan and Vargas in May, June, July, and August 2009, Plaintiff's diagnoses and physical findings remained largely the same. (R. at 355 – 66). She did endorse an increasing burning sensation in her knees. (R. at 355 – 66). However, Plaintiff's activity level had increased, and she regularly requested decreases in prescription pain medication strength. (R. at 355 – 66). Plaintiff stated that her medications were providing her with relief. (R. at 355 – 66). Nonetheless, she stopped taking a medication that "worked great," because of the cost. (R. at 359). Dr. Vargas noted that Plaintiff's exercise program had been "going well for her." (R. at 361).

At an August 26, 2009 appointment with Dr. Shoreibah, Plaintiff complained of back pain, and had questions regarding her pain management regimen. (R. at 335 – 36). Dr.

9

Shoreibah informed Plaintiff that she should confer with her pain management physician with such questions. (R. at 335 – 36). He prescribed Plaintiff Vicodin. (R. at 335 – 36).

An MRI study of Plaintiff's lumbar spine was conducted on September 1, 2009. (R. at 334). It was concluded that the findings demonstrated grade 2 anterolisthesis at the L4-L5 level of Plaintiff's spine, compromise of the right L4 nerve root within the right intervertebral foramen with flattening and swelling. (R. at 334). No disc herniation was found in the lumbar spine. (R. at 334). The remainder of Plaintiff's spine was without abnormality. (R. at 334).

On September 2, 2009, Plaintiff reported to Dr. Vargas that she had recently suffered an increase in back pain that was so severe that she had an emergency MRI. (R. at 355). In spite of this change, she wished to continue decreasing her pain medication and add an anxiolytic medication. (R. at 355). Her physical findings and diagnoses were relatively unchanged from earlier pain management appointments. (R. at 355 – 56).

Dr. Khan noted in a pain management treatment note from October 2, 2009, that the burning in Plaintiff's hip and legs had increased to the point that Dr. Shoreibah referred her to an orthopedic physician. (R. at 353). Plaintiff had been exercising on a treadmill and taking ibuprofen for pain. (R. at 353). Dr. Shoreibah advised Plaintiff to stop both until she was examined by the orthopedist. (R. at 353).

Plaintiff was examined by orthopedic surgeon Donald Sachs, M.D. on October 22, 2009 by referral from Dr. Shoreibah. (R. at 343 – 45). Dr. Sachs' noted that Plaintiff complained of severe pain in her lower back. (R. at 343 – 45). She also complained of a severe sitting intolerance and associated radiation of pain into the right leg. (R. at 343 – 45). She mentioned occasional numbness of the right leg, as well. (R. at 343 – 45). Plaintiff explained to Dr. Sachs that her pain had worsened since her treatment with Dr. Puri, that she could no longer work, and

10

that she moved in with her mother for support. (R. at 343 – 45). Dr. Sachs felt that "there is no reason why at this point in time she cannot work, even part-time." (R. at 343 – 45). Dr. Sachs noted that Plaintiff appeared excited by this news. (R. at 343 – 45).

Plaintiff was seen by Dr. Vargas on October 28, 2009. (R. at 351 – 52). She informed him that since her last visit, she had seen an orthopedic physician and that she was to have some sort of surgery. (R. at 351 – 52). However, she explained that the L4-L5 level of the spine would not be fused, and that surgery on the S1 level of the spine was being reconsidered. (R. at 351 – 52). Plaintiff's physical findings and diagnoses were otherwise the same, and she was noted to be taking Hydrocodone for pain and Alprazolam for anxiety. (R. at 351 – 52).

Plaintiff was seen again by Dr. Vargas in November and December 2009. (R. at 347 – 50). Plaintiff's physical findings and diagnoses were unchanged. (R. at 347 – 50). She complained of muscle tightness and burning in her right hip and leg. (R. at 347 – 50). She reported seeing a neurosurgeon, and that she could be undergoing surgery in the near future. (R. at 347 – 50). Yet, she also expressed a desire to reduce – even stop – taking prescription pain medication. (R. at 347 – 50). The medication she had been taking was working "very well," and was used on an as-needed basis. (R. at 347 – 50).

Plaintiff was evaluated by a "Dr. Webb" on December 8, 2009. (R. at 382 – 88). Dr. Webb indicated that he was a spinal specialist. (R. at 382 – 88). He diagnosed Plaintiff with grade II spondylolisthesis, degenerative disc disease, lumbar stenosis, and lumbar radiculopathy. (R. at 382 – 88). Plaintiff's prognosis was "good with surgery." (R. at 382 – 88). Plaintiff had limited range of motion in the lumbar spine, as well as tenderness. (R. at 382 – 88). Her gait was abnormal. (R. at 382 – 88). Straight leg raising was negative. (R. at 382 – 88). Activity was found to exacerbate Plaintiff's pain. (R. at 382 – 88). Dr. Webb opined that Plaintiff was

11

incapable of working, without providing any functional limitations. (R. at 382 – 88). Without surgery, Dr. Webb believed that Plaintiff would be unable to work for at least twelve months. (R. at 382 – 88).

Plaintiff continued to participate in pain management with Drs. Khan and Vargas between January and April 2010. (R. at 445 – 55). Plaintiff's diagnoses and physical findings were consistent with her previous visits. (R. at 445 – 55). Plaintiff indicated that her medications were working well, except in the morning. (R. at 445 – 55). When Plaintiff lost weight, she found that her pain lessened. (R. at 445 – 55). She was taking prescription Hydrocodone and Alprazolam, but also took Soma, MS Contin, and Flexeril at various times. (R. at 445 – 55). She still wished to decrease her use of pain medications. (R. at 445 – 55).

On April 12, 2010, Dr. Puri authored an opinion of Plaintiff's functional abilities based upon his treatment history with her between 2005 and 2008. (R. at 395 – 403). He noted that her diagnoses had been spondylolisthesis with spinal stenosis and L4-L5, arthritis in the right knee, and broken hardware in the left ankle. (R. at 395 – 403). Plaintiff's prognosis for these impairments was "poor." (R. at 395 – 403). Plaintiff had limited range of motion, tenderness, muscle spasm, sensory loss, and reflex changes in the affected portion of the back and extremities. (R. at 395 – 403). Plaintiff had an abnormal gait, crepitus, trigger points, and positive straight leg tests. (R. at 395 – 403). Her pain was severe and was accompanied by numbness. (R. at 395 – 403).

Dr. Puri opined that – following a future spinal surgery – Plaintiff would experience limitations that would extend for at least twelve months, and would frequently interfere with her ability to work. (R. at 395 – 403). Plaintiff would not be able to walk more than one or two blocks. (R. at 395 – 403). Walking, prolonged sitting, bending, stooping, lifting, and cold

12

weather would exacerbate Plaintiff's pain. (R. at 395 – 403). She could not maintain a constant neck position. (R. at 395 – 403). In an eight hour work day, she would be able to sit no more than two hours, and stand/ walk no more than two hours. (R. at 395 – 403). She would have to stand every thirty minutes for approximately ten minutes at a time. (R. at 395 – 403). Plaintiff could only occasionally lift and carry five to ten pounds. (R. at 395 – 403). Additionally, Plaintiff would need to avoid wetness, temperature extremes, humidity, heights, pushing, pulling, kneeling, bending, and stooping. (R. at 395 – 403). She would need to take unscheduled breaks and would be absent more than three times per month. (R. at 395 – 403).

Plaintiff was evaluated by podiatrist Matthew Werd on April 20, 2010. (R. at 404 – 11). She had been examined once by Dr. Werd on April 6, 2010. (R. at 416). Dr. Werd noted Plaintiff's history of pain emanating from broken surgical hardware in her left ankle. (R. at 404 – 11). With removal of the hardware, Plaintiff's prognosis was "good." (R. at 404 – 11). With the broken hardware, Plaintiff's left ankle had limited range of motion and tenderness. (R. at 404 – 11). Due to pain, Plaintiff would not be able to sustain ambulation or complete activities. (R. at 404 – 11). Plaintiff could stand and walk no more than one or two hours of an eight hour work day. (R. at 404 – 11). She could sit for eight hours. (R. at 404 – 11). She could occasionally lift and carry ten to twenty pounds. (R. at 404 – 11). Her left leg would need to be elevated to prevent swelling. (R. at 404 – 11). She could not push, pull, kneel, bend, or stoop, and would likely miss two or three days of work per month. (R. at 404 – 11).

In her last pain management on record from May 2010, Plaintiff's physical symptoms and diagnoses were the same as in previous examinations. (R. at 456 – 57). Plaintiff reported that her medications were helping her pain, and that she was preparing for surgery on her back and ankle. (R. at 456 – 57). She reported no other changes. (R. at 456 – 57).

13

## C. Administrative Hearing

At her hearing, Plaintiff testified that she maintained a driver's license and drove ten or eleven times per month – mostly local driving for the purpose of attending appointments. (R. at 39). Plaintiff was driven to her hearing by her mother. (R. at 39). She had difficulty doing simple chores, such as washing dishes, and had difficulty lifting her legs to get into the shower or bathtub. (R. at 60 – 62). Plaintiff could shop for a limited period of time, but did not go by herself due to weakness in her legs and the potential for falls. (R. at 62).

Plaintiff last worked as a mortgage brokerage loan officer from October 2006 until March 2008. (R. at 42 – 44). During that time, Plaintiff worked mostly from home and did not attempt to obtain new clients – she serviced only her already existing client base. (R. at 43, 57 – 58). When she did come into work, it was only for brief periods, and Plaintiff spent most of the time sitting. (R. at 43, 45 – 46). She had taken this reduced work-load as a result of progressively worsening physical ailments. (R. at 44). Specifically, Plaintiff could no longer climb stairs, get in and out of a car, sit at a desk for prolonged periods, or walk any significant distance due to back and knee pain. (R. at 44 – 45, 56).

Plaintiff's back pain had begun to noticeably interfere with her ability to perform job-related duties as far back as 2003 – 2004. (R. at 47, 53). She had limited range of motion in the spine. (R. at 54, 62, 66). Plaintiff had the worst pain on her right side, and it often radiated down her hip and into her right leg. (R. at 55). The only relief Plaintiff achieved was by lying down or standing in a pool. (R. at 55, 58). She no longer had a comfortable position that allowed her to be free of pain. (R. at 59). Plaintiff experienced two to three days of pain per week that were so excruciating that she was relegated to her bed for the duration of the day. (R. at 65).

14

Plaintiff also experienced substantial foot pain due to broken hardware implanted during an ankle operation in 2001. (R. at 47 – 48). On a better day, Plaintiff stated that she could walk a distance of approximately five to ten houses. (R. at 49). On a worse day, Plaintiff could not bear weight on her foot until she could massage the broken hardware into place. (R. at 49, 52). Plaintiff had serious issues with her foot and ankle at least once per week. (R. at 51).

Plaintiff was waiting to have surgery to ameliorate her back and foot pain. (R. at 49 – 50, 66 – 67). She was on the "lowest milligram of the Percocet," due to a mild allergy to Tylenol. (R. at 55). It helped to dull the pain to the extent that it made it "more tolerable." (R. at 55 – 56). Plaintiff believed that she could eventually return to work if she were to have back and ankle surgery. (R. at 67).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his

15

past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[2], 1383(c)(3)[3]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v.*

---

[2]     Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3]     Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

## V.   DISCUSSION

In his decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of "a back disorder and status post fracture of left ankle hardware placement." (R. at 21). Due to the above impairments, the ALJ determined that Plaintiff would be capable of a full range of sedentary work, limited to no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R. at 21). Despite said limitations, Plaintiff was not found to be eligible for benefits, because the limitations would not preclude Plaintiff from engaging in her past relevant work as a "payroll manager," according to the Dictionary of Occupational Titles, #215.137-014. (R. at 29).

17

Plaintiff objects to the above determination, arguing that the ALJ erred in failing to properly credit the opinions of numerous physicians whose medical findings allegedly supported Plaintiff's disability claim, in failing to properly credit Plaintiff's subjective complaints of pain and limitation, and in failing to make a proper Step 4 determination. (ECF No. 12 at 17 – 27). Defendant counters that the ALJ's reasoning and ultimate determination were supported by substantial evidence. (ECF No. 14 at 7 – 19). The court finds Plaintiff's arguments to be persuasive.

## A. Medical Opinions

Plaintiff first argues that the ALJ's analysis of the medical findings of Drs. Puri, Werd, Webb, and Sachs was inconsistent and unreasonable. (ECF No. 12 at 17 – 23). In terms of an examining physician's opinion, such may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F. 2d 1348, 1350 (3d Cir. 1987)).

However, "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)). A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Brownawell*, 554 F. 3d at 355. Moreover, a medical opinion is not entitled to any weight if unsupported by objective evidence in the medical record. *Plummer*, 186 F. 3d at 430 (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)).

18

With respect to Dr. Puri, the ALJ gave his opinions little weight at the time of his decision, because the opinions covered a limited time period during which Dr. Puri treated Plaintiff, and because the opinions seemed to specify only that Plaintiff would be unable to work following surgery. (R. at 28). However, this rationale bears no direct relation to the validity of Dr. Puri's medical conclusions regarding Plaintiff's functional capacity during her time under his care. Dr. Puri noted that Plaintiff experienced significant pain while he monitored her conditions between 2005 and 2008. While Plaintiff had achieved some degree of relief through physical therapy and medication management, she still experienced functional limitations. Her physical condition had worsened while in his care. Plaintiff was noted to require surgery for relief, based upon diagnostic imaging studies. Conservative treatment was noted by Dr. Puri to have failed. No internal inconsistencies in any of Dr. Puri's medical notes were cited by the ALJ. No inconsistencies with the findings of Drs. Kahn, Vargas, or Webb were noted, either.

The ALJ relied upon the less severe findings of two non-treating state agency consultants and the opinion of Dr. Sachs to bolster his finding that Plaintiff was not as limited as Dr. Puri believed. However, whereas Dr. Puri's opinions were supported by objective medical testing and treatment notes on the record, the ALJ cited to no such findings to support Dr. Sach's vaguely defined conclusion that Plaintiff had the capability to work. Similarly, the state agency evaluators did not provide a rationale to justify their differing opinions of Plaintiff's functional capacity. The ALJ cited findings that Plaintiff's pain management physicians reported Plaintiff experienced some degree of relief with pain medication and exercise, but failed to indicate how this directly correlated with an ability to work a full-time job, eight hours per day, five days per week. He also failed to note that Drs. Khan and Vargas regularly recorded Plaintiff's complaints of pain, much as Dr. Puri had. While the ALJ noted that neither pain specialist opined that

19

Plaintiff could not work, neither did they opine that she could. This rationale was simply inadequate to summarily dismiss the findings of Dr. Puri.

With respect to the findings of Dr. Werd, the ALJ similarly failed to adequately address medical findings. Dr. Werd found that Plaintiff would be unable to sustain ambulation, complete activities, push, pull, kneel, bend, or stoop, would likely miss several days of work per month, and would require accommodation so that she could elevate her left leg. While the ALJ appeared to rely upon Dr. Werd's finding that Plaintiff could sit for eight hours during the work day, although Dr. Werd was only analyzing Plaintiff's ankle-related limitation – not her back and legs, he failed to specifically address the other findings. He provided no objective evidence to contradict the findings. While Plaintiff could occasionally walk her dog short distances, and complete some undefined form of exercise on a treadmill, this hardly contradicted Dr. Werd's findings. No evidence was provided which demonstrated that this level of activity approximated the rigors of working a full-time job, eight hours per day, five days per week. Even sedentary work as a payroll manager – whether defined by Plaintiff or by regulation – encompasses "a certain amount of walking and standing." 20 C.F.R. §§ 404.1567 and 416.967. Dr. Werd's findings should not have been so summarily dismissed.

With respect to Dr. Webb, however, the ALJ was justified in according the findings little weight, because few findings were actually made. Simply stating that Plaintiff could not work – while relevant to a degree – is not dispositive, and is a determination within the sole province of the ALJ. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Dr. Webb's opinion provided little in the way of illustrating Plaintiff's degree of functional limitation, and so was entitled to little weight.

Peculiarly, while the ALJ quickly dismissed Dr. Webb's opinion because of a lack of findings, he equally quickly adopted the opinion of Dr. Sachs. Dr. Sachs had one incomplete

treatment note on the record. It included a recitation of Plaintiff's complaints and a statement that Plaintiff was capable of working in some respect – though he only seemed to indicate that she would be capable of part-time work. He provided no objective support to justify this conclusion, and – indeed – it clashed with the opposite finding of Dr. Puri, a treating physician with an established treatment record and objective evidence to support his conclusions.

The ALJ attempted to bolster his opinion by citing to Plaintiff's ability to "move fluidly" during her hearing, although there is no indication as to what exactly that means, that Plaintiff was capable of making a one-time move from California to Florida to live with her mother, and that she attempted to be more active and exercise. While this is certainly evidence that Plaintiff was not bedridden, the ALJ failed to explained how this correlated to an ability to work a full-time job, eight hours per day, five days per week. The single medical statement made by Dr. Sachs in his treatment note is hardly evidence to this effect. He merely states she can work in some capacity, and provided no evidence to substantiate his conclusion. This does not constitute substantial evidence of an ability to work.

**B. Subjective Complaints**

Plaintiff next argues that the ALJ unfairly rejected her subjective complaints of pain and limitation based upon an improper review of the medical evidence on record. (ECF No. 12 at 23 – 25). It is established precedent in the Third Circuit that an ALJ should accord subjective complaints of pain similar treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 122 (3d Cir. 2000). Serious consideration must be given to subjective complaints of pain where a medical condition could reasonably produce such pain. *Mason v. Shalala*, 994 F. 2d 1058, 1067 – 68 (3d Cir. 1993). Moreover, there need not be objective evidence of a subjective complaint, and the ALJ must explain his

21

rejection of same. *Id.* (quoting *Green v. Schweiker*, 749 F. 2d 1066, 1071 (3d Cir. 1984));

*Burnett*, 220 F. 3d at 122. When medical evidence provides objective support for subjective

complaints of pain, the ALJ can only reject such a complaint by providing contrary objective

medical evidence. *Mason*, 994 F. 2d at 1067 – 68. Even when an ALJ has personally observed a

claimant, personal observations may not be the sole basis for rejecting subjective complaints of

pain. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999) (citing S.S.R. 95-5p

at 2 (1995)). However, while pain itself may be disabling, and subjective complaints of pain

may support a disability determination, allegations of pain suffered must be consistent with the

objective medical evidence on record. *Ferguson v. Schweiker*, 765 F. 2d 31, 37 (3d Cir. 1985);

*Burnett*, 220 F. 3d at 122.

Here, the ALJ failed to provide objective evidence contradicting Plaintiff's claims. The

ALJ cited Plaintiff's ability to "move fluidly" during her hearing, her ability to make a one-time

move from California to Florida to live with her mother, her ability to engage in an unknown

degree of physical activity for exercise, her ability to obtain a generally unknown degree of relief

from pain medications, and a single statement from a one-time examining physician – whose

notes contain no objective medical findings – that Plaintiff can work in some undefined capacity,

as evidence that her subjective complaints of pain and limitation were inflated.

What the record does show is that Plaintiff consistently complained to treating physicians

such as Dr. Puri, Dr. Khan, and Dr. Vargas, of ongoing – typically worsening – back and leg

pain. Physical examinations and diagnostic imaging studies revealed consistent findings of

degeneration and limitation. No doctors questioned the veracity of Plaintiff's complaints. While

Plaintiff did report engaging in a limited degree of daily activity, such as walking a dog, the ALJ

failed to demonstrate a correlation between these activities and engaging in full-time work, eight hours per day, five days per week.

The court appreciates the ALJ's finding that Plaintiff's complaints of pain and limitation, activities, and physical condition fluctuated in certain respects over several years of treatment. However, Drs. Khan and Vargas made consistent notations of Plaintiff's complaints of pain, and consistent physical examination findings revealing the presence of pain and limitation in movement. Three examining physicians corroborated Plaintiff's assertion that she could not return to work without surgery to improve her physical conditions. In Defendant's motion, it is argued that Plaintiff's failure to seek surgical intervention, and her failure to justify not seeking other means of paying for surgical intervention in lieu of health insurance, weighed against her. (ECF No. 14 at 16 n. 4). Nonetheless, the ALJ did not appear to rely upon this in his decision rationale, therefore the court will not entertain it as a justification for denying benefits. In all, the court finds the ALJ's treatment of Plaintiff's subjective complaints of pain and limitation to be lacking, and without the support of substantial evidence.

## C. Step 4 Analysis

In her final point, Plaintiff argues that the ALJ failed to properly analyze Plaintiff's ability to return to her past relevant work as a payroll manager. (ECF No. 12 at 25 – 27). The court need not reach this issue, however, because the ALJ's inadequate analysis of Plaintiff's medical record and subjective complaints may have rendered his RFC assessment insufficient to encompass all legitimate limitations stemming from Plaintiff's impairments. The court will not, therefore, hold that the ALJ's finding that Plaintiff could return to past relevant work was supported by substantial evidence.

23

## VI.   CONCLUSION

Based upon the foregoing, the court finds that the ALJ failed to properly support his decision to deny benefits to Plaintiff with substantial evidence. Accordingly, Plaintiff's Motion for Summary Judgment is granted to the extent remand for reconsideration is sought, and denied to the extent reversal and an immediate award of benefits is sought; Defendant's Motion for Summary Judgment is denied; and, the decision of the ALJ is vacated and the case remanded to the Commissioner for further consideration consistent with this opinion.

"On remand, the ALJ shall fully develop the record and explain [his or her] findings... to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F. 3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 432 (W.D. Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

Appropriate orders follow.

March 26 2013

                                        *s/ Cynthia Reed Eddy*
                                        Cynthia Reed Eddy
                                        United States Magistrate Judge

cc/ecf: All counsel of record.